The government in this case failed to prove any of the essential elements of a § 1592 penalty case against Ford. It failed to prove a violation, it failed to prove that any violation was the result of gross negligence, and it failed to prove the amount of any unpaid duties resulting from that violation. With respect to the § 1484 claim of the government, the CIT held that Ford violated § 1484 in two separate respects. First, that Ford did not disclose on its entries of tooling and dies in this case that entered values might change. And second, that Ford failed to declare the value of engineering orders on its entries. With respect to the first issue, I would submit that this court's Hitachi decision is controlling. It's directly on point and directed contrary to the court's decision. Because this issue has been pretty fully explored in the prior argument, unless the court has any further questions about Hitachi, I'd like to move on to the second aspect of the court's § 1484 analysis. And that was that Ford violated § 1484 by failing to include the value of engineering orders when entering the goods. The trial court's and the government's basic error with respect to this claim stems from a mistaken premise. The premise is that an importer is obligated to disclose at entry all engineering orders relating to the project at issue. That's not the law. The law is that the importer is required to declare the known value of the merchandise being imported. What Ford did here is declare the value of the merchandise being imported based on the best and, in fact, the only information that was available to Ford at that time, the invoices. That's all it needed to do to comply with § 1484, and that's what it did. The government's and the trial court's fixation on the engineering orders as the smoking gun proof of the violation highlight at least three fundamental and, in our view, dispositive problems with the government's case. First of all, the majority of the engineering orders at issue here were not issued until after the last entry at issue in this case. So it's undeniable that Ford could not, at the time of entry, have known the value of all the engineering orders, even those that had not been issued yet. Equally important, the trial court's § 1484 analysis completely ignores the fact. The fact that everyone involved in this case has acknowledged that much of the work called for under the engineering orders was to be performed in the United States and, therefore, was not dutiable. It's undisputed that this project called for significant work to be done in Japan and for significant work to be done in the United States. Indeed, the testimony made clear that Ogihara America Company undertook a significant expansion of its U.S. facilities to accommodate that work. It's also the case that the order, as the trial court found, that the orders themselves, the engineering orders, did not specify where the work was going to be performed. It's also undisputed that the majority of these orders, the vast majority of them, were issued to Ogihara America, and all of them were delivered to Ogihara America's offices in Howe, Michigan. It's also undisputed that in October of 1988, Ford issued a freeze on engineering changes, the effect of which was that Ford understood that any engineering orders issued after Thanksgiving of 1988 would involve work that was going to be done in the United States. Did they label these imports as provisional? Your Honor, there's no proof that we did not label these imports as provisional. The government did not admit the entries at issue. Did you label these imports as provisional? The evidence in the record is that Mr. Gibson, Ford's counsel, instructed the brokers in this case to label the entries as provisional. And there were standing orders to brokers and to vendors, to brokers, to enter... Did that happen? I don't know from the record what the entries say, because I don't have them, but I believe that the, since it's the government's burden to prove that it didn't happen, that the court should presume that it did not happen here, that it did happen here. But even if it didn't happen, for the reasons under Hitachi, that is not a violation of Section 1484. The government, by the way, with respect to Section 1484, says that Ford had... Did the court find that it didn't happen? The court did find that it didn't happen. Why isn't that the record that we're dealing with here? Well, there's nothing in the record to support that decision, Your Honor, and so if that's the finding, it's clearly an erroneous finding that we would submit. But our main point is that it doesn't, even if it didn't happen, Your Honor, it's not a violation of Section 1484, because Hitachi, as Hitachi construed 1484, that's not an obligation of the court. The fact that Ford had a policy in the case of tooling and die entries to note that entries are provisional does not create a legal obligation under 1484 to do so. That was a voluntary policy that it had in the case of tooling and die entries. What about the factual finding made by the CIT that the declared values were admitted information relating to the engineering change orders? That Ford did have in its possession the information sufficient to give it knowledge. I mean, that's a factual finding made by the CIT. The finding that Ford had in its information had in its possession the engineering change orders? It did, Your Honor. That doesn't create a legal duty to declare the value of those engineering orders when, as for the reasons I've stated, that it was not clear that, in fact, Ford had every reason to believe that the work called for under those engineering change orders would be performed in the United States. No, Your Honor. The evidence is, at the time, because Ford had issued this engineering change, the effect of which it understood to mean that work on engineering orders issued after Thanksgiving would be performed in the United States. And all of these engineering orders were issued after Thanksgiving in 1988. So at the time, which is the pertinent period here, Ford had reason to believe that none of the work would be performed in Japan, that all of it would be performed in the United States. Also, as we talk about in our brief, there's no proof in this case that the entries did not include at least some of the engineering orders. We talk about this in our brief on pages 26 and 27. The court and the government has just assumed that they do not. Was it declared as a value at that point? I'm sorry? Was it declared as an engineering value at that point? Well, the entries had a total declared value of $63 million. And as Ford's later audit showed, the value of the original tool order and the original amendments to that amounted to at most $58 or $59 million. So it's clear, I think, that the balance there must have included some of the engineering orders. That's a presumption. It's not in the record. Well, that is in the record. The 63 and the 58. The numbers are in the record, Your Honor. But not the determination as to whether the differential was an engineering change. No, the court made no finding to that effect. But the court's analysis more or less just assumed without any evidence that these engineering orders were not declared. Isn't the burden on you and the statute to supply enough information to make sure that there can be a proper evaluation? Yes, Your Honor, it is. And the information that we supplied was based on the invoices. It's the government's burden that we committed some type of misrepresentation with respect to those invoices. And in your case, it's a gross negligence, not just negligence. That's right, Your Honor. So there's no issue, as there might be in the Capri case, about a burden switching to Ford. In fact, the customs had to really kind of ferret out the engineering orders. And you didn't disclose even when you were asked the first time, right, the full information? Isn't that what made this one kind of gross rather than just negligent? Well, that's not what the court relied upon, I believe, in finding gross negligence. I think what the court relied upon was we didn't declare it, so therefore it must be gross negligence. There were several findings to that effect in the court's opinion. But with respect, it is true that in responding to— But there were CF-28s, and you didn't respond, right? The CF-28s did not—the initial responses to those did not disclose the engineering orders. And it turned out that Ford's Customs Compliance Department itself did not learn of the existence of those until later. But then it did disclose the existence of those engineering orders once it found those out. That does not mean, however, that those engineering orders weren't reflected in any of the entries or anything like that. That's a separate issue. If I can turn to Section 1485 for a moment. The court's 1485 analysis falls, I believe, for the same reason as its 1484 analysis, because it's based on the same mistaken premise that all engineering orders relating to a project must be disclosed to customs on a real-time basis, either at entry or when issued after entry. That is not the law. The law is that an importer is obligated under 1485 to provide information to customs at once when the information relates to the assessment of duties. What does at once mean, then? Well, in this case— If it's not immediate. But the point here, Your Honor, is that the issue has to—it goes to, does the information relate to the assessment of duties? And that was not determined or determinable until Ford concluded its audit of OVR and performed a reconciliation of OVR. It did that. The record reflects it finished that audit in June of 1991, and it disclosed the existence of these engineering orders in August of 1991. So there was roughly a 40-day lapse there. I would submit that that cannot—it's not crystal clear what at once means in this context, but it can't mean that an importer should be held liable for gross negligence when it takes 40 days to disclose the existence of engineering orders, when the record, I think, is very clear that that 40-day lapse didn't affect customs administration of its duties at all. So if I could turn briefly to the issue of gross negligence. This Court noted in Hitachi that that is a factual issue to the extent it revolves around questions of intent. We would submit that that finding is predicated on a series of—the finding in this case is predicated on a series of analytical mistakes that constitute legal errors. First, as I mentioned, the Court time and again held that the mere fact of violation constitutes gross negligence. Examples can be found on pages 1321 and 1326 of the decision. It also—another way of looking at the same issue is that it effectively switched the burden to four to prove the absence of gross negligence. You can find examples of where the Court explicitly did that on pages 1322, 1323, and 1324. Can you give me the place on 1321 or 1326 where he presumes that a violation is gross negligence? What he says on 1321 is—it's in the second column on the right page, on the right-hand column of the page. He's commenting—the Court is commenting on the fact that Ford had certain pre-entry mechanisms in place to prepare for entry. And then the Court says, both pre-entry mechanisms failed to occur with the FN 36 entries, resulting in the wanton disregard for the engineering purchase orders. So the Court held effectively that if Ford has a compliance program and that compliance program, quote, failed to occur in one instance, that that constitutes a wanton disregard for its obligations under the customs laws. The Court did something similar on page 1326, where— But he goes on to say the minimal mechanisms Ford may have implemented represent an institutional indifference to really reporting. And, Your Honor, there's—I would make two points with respect to that. That those types of findings about Ford's compliance efforts cannot be reconciled with other findings within the same—within the Court's opinion, or with its findings in the Capri case, in which the same evidence was presented to the Court. The institutional indifference constitutes an utter lack of care. With—Your Honor, I don't believe there's anything in the record to show that there was an institutional indifference. There was everything in the record to show that Ford had multiple layers of compliance programs. Yes, to the extent that Ford had an obligation to disclose these engineering orders sooner, which we don't believe it did, those compliance mechanisms didn't work in this case. But that is not to say that there's an institutional indifference. The Court made multiple findings about how Ford wanted to be forthright with Customs and how it had an intent to comply with the Customs laws. Okay, thank you. Thank you, Mr. Calvatriano. Mr. Dredge. Your Honors, in this case, Ford made a contract with Ogahara Iron Works of Japan in 1987 to import tooling. And the contract involved a base purchase order price, which began at $43 million. And by the time of the importation, which was in February or March of 1989, the base purchase price had been amended by amendments that were part of the initial purchase order, and they drove the price up to about $78 million. And in addition, Ford recognized at a launch meeting that was in October of 1988 before it exported, before it received the goods in the various ports, Seattle, L.A., and Detroit, that there were engineering changes that had occurred to the styling of the Lincoln Continental, which was what this tooling was designed to produce, body parts for the Lincoln Continental. And that in addition to the amendments to the base purchase order, these engineering changes, which were encompassed in verbal agreements between the purchasing end of Ford and Ogahara Iron Works, which were to be later turned into formalized papers, but at that point, while the merchandise was still being manufactured in Japan, were not formalized papers for the most part, although in some cases they were, that there would be at least $15 million additional in engineering changes by the time the material was imported. Ford knew that, and if you look at the appendix where what's set forth is these engineering change orders, you will see that $15 million worth of engineering change orders indicate that the changes were completed before the merchandise was imported. Those changes, by the clear evidence in the record in this appendix in this court, resulted from work done in Japan, and that money that was owed for that work, Ford knew about before it ever received the merchandise in the United States. Notwithstanding that, in October of 1988, prior to the importation, there was a meeting at which Ford discussed how it should ask the exporter, Ogahara, to formulate the invoice, and it told Ogahara to formulate the invoice, to tell Customs that the purchase price was the base purchase order price alone, and it told, by telling Ogahara Iron Works to do that, the invoices that Ford presented to Customs indicated a price of $63 million, when it knew at that time that there had been at least $15 million worth of additional engineering changes that had been done in Japan that weren't going to be done in the United States, that were done in Japan, and that it was telling the preparer of the invoices, Ogahara, not to tell Customs about that. And when the merchandise was imported, the only representation Ford made was that the purchase price was the base purchase price of $63 million. Customs then asked for more information about that representation. It asked for information in March of 89, right after the material was imported, because tooling tends to be complex, and Customs likes to know about the nature of the tooling. It likes to see pictures of the tooling, and it likes to see proof about what the cost of the tooling is. Three ports asked for information about those imports, Seattle, Detroit, and L.A. Excuse me, Seattle, Detroit, and L.A. And it asked for information on CF-28s, which are formalized papers that say, give us information about the price. Ford answered those CF-28s by signing the CF-28 and swearing that it would provide accurate information in response to the CF-28, because the form itself requires the importer to swear that the information he's providing is accurate information. The only time Ford answered the CF-28 was in November of 89, and it answered the CF-28 from the Port of Detroit. And it still said that the price was $63 million, even though the price was even more than $15 million higher than $63 million at that point, because some additional engineering changes had been done. The other CF-28s that were issued by Seattle and L.A. weren't answered at all until 1991, when Ford was issued a subpoena, or a summons for records, and at that point realized that its goose was cooked, so to speak, and it had to come up with the information. It said in its initial response that its audit was not yet completed, and it would provide more information when the audit was completed. In fact, the trial court found that was another deceit, because the audit was completed, and it didn't disclose the engineering change orders. When it finally disclosed the engineering change orders in August of 91, it conceded that it had not disclosed those before, and the actual price was $95 million, not $63 million. The CIT said that the only evidence that it saw that it had was this issue that came out in the internal audit. You have told us a story of all sorts of evils that are not perhaps represented in the finding of negligence. With respect, Your Honor. It doesn't fit. What the CIT said was that the audit distinguished among the engineering orders to identify which work was done in Japan and which work was done in the United States, but contrary to Ford's position, it doesn't matter where the work was done. But the court said that this was the only evidence, and you've been telling us all sorts of evidence. I don't believe. There's a plethora of evidence about knowing of those engineering change orders by November of 89. It's true. The audit was completed. The only evidence presented to the court of a post-entry mechanism that accounted for the FN-36 costs, and then they talk about the internal audit. I guess what the judge is saying there is that Ford had no mechanisms to capture those. I don't know. I'm just trying to correlate what you're telling us, which is a story which doesn't sound particularly like negligence, puts Ford in a very bad light, and even though the CIT assessed a heavy penalty, it doesn't seem to be reflected in the decision of the CIT. The CIT says Ford was indifferent to answering the CF-28s. It was not a high-priority affair. The CIT points out that the CF-28s were in part not answered at all, and when they were answered, they were answered incorrectly. The CIT points out that one of the responses told customs that the audit was not yet completed when the formal audit paper had been completed a month before that CF-28. So there's a plethora of evidence that the CIT relies upon in finding gross negligence. There's also no question that the entry records did not inform customs of any of this information. Customs conceded that at the trial because in August of 1991, it made what it called a prior disclosure, which was the first time it informed customs about the 206 engineering change orders. There was no question it had not disclosed those engineering change orders prior to two years after the entries, despite representing in responses to CF-28s on at least three occasions before that August 1991 disclosure that the- Well, I'm trying to correlate the standard criteria of gross negligence, which goes beyond simple negligence, carries a heavy penalty, and I gather from what you're telling us, we should infer that there was culpable activity rather than negligent activity. There was extremely culpable activity. We don't have a finding of culpability? Is this something that you think we should find for ourselves? I think the trial court's analysis of the level of culpability is accurate. We found negligence. The trial court found gross negligence with Ogarher. We found gross negligence. Gross negligence. So you're saying that there is an inference or more than an inference of deliberate misrepresentation. Wanted disregard of a known obligation, and that's what the trial court found and that's what I think the evidence supports. Ford had nothing really to say about the fact that it knew about the engineering changes. It didn't report them. It knew it was supposed to answer the CF-28. It didn't do that. It knew it was supposed to report its own audit. It didn't do that until a subpoena was issued for records. In my mind, there's a little dispute about many of the facts. What Ford focused on was that it said it wanted to reduce penalty because it had made a prior disclosure. The trial judge said, however, there was no prior disclosure. At the time you made your disclosure, you were aware Customs was investigating these entries and you were aware of the fact of the investigation. On the substance of what Ford did, it's hard to find a lot of dispute in a lot of areas, and I think the trial judge's opinion reflects that. The trial judge found there was no fraud because we couldn't prove or weren't able to prove a specific intention to either violate the statute or deprive the government of duties. But in terms of a wanton and reckless inability or unwillingness to have systems in place that would prevent what happened from happening, the trial court resoundingly said that there's overwhelming evidence that a company with a statute of Ford should have been able to do that and didn't. From the very beginning, it's incomprehensible why Ford didn't report those engineering change orders when he knew about them before the exportation of the merchandise, but it didn't. It was incomprehensible to the trial judge why they didn't answer these CF-28s accurately. I mean, the suspicion was that somebody knew a mistake had been made and didn't want to fess up to the mistake, but that is not something that reduces gross negligence. That's an indication of additional gross negligence. The only other issue Ford really raises is one of calculating the loss of the revenue, but the government simply adopted what Ford gave to the government. In other words, when Ford finally made the disclosure that there was an additional $35 million worth of value that it hadn't disclosed, it identified the engineering change orders and valued or priced each engineering change order. The Customs Service, when it did an appraisal to determine the loss of revenue prior to filing the administrative case for civil penalty, followed the information that was given by Ford and audited that and made one or two corrections but basically used what Ford gave it. Ford wants to now complain that there were certain entries that weren't taken account of. It complains that some of the classifications were incorrect, but the trial judge addressed all of that and found as a factual matter that the appraisal was correct because it was based on what Ford gave Customs and there was no evidence of anything about it that was not correct. So the trial judge found that there was a total loss of revenue of around $800,000, that about $650,000 had been paid previously. So he ordered the payment of the additional loss of revenue, about $180,000, and he didn't impose the top penalty, which could have been about $3,400,000, but instead imposed $3 million, and we respectfully submit that that was, at minimum, a proper and well-founded penalty to impose in a case of this nature. If there are no further questions, I'll let it go. Mr. Leavitt, with respect to 1484, going back to that and without beating a dead horse, what about the necessity of imposing or establishing a duty on the importer under 1484, a positive duty to disclose exact prices and items? Would that be a good rule, a bad rule, or otherwise? As I say, Your Honor, I think Congress has imposed that rule, but if it's implicit, I mean, if you look here, I can read you 1484. It says, any material information. The trial judge in Hitachi said, it's obvious to me that if the price could change material, you said it's in there. You really didn't come down and say it's totally clear. You said it's probably implicit because you didn't take back what the trial judge had said, but you said in Hitachi that because of a potentially contrary ruling, the importer may be confused, so there was no penalty. I think it would be useful to come in one of these two opinions and say what you meant in Hitachi, which is that it's obvious that if there's an escalation clause, 1484 requires the disclosure of the escalation clause. What harm? I mean, if it's a choice between over-disclosure and under-disclosure, I would think if you have to err in one direction or the other, it would be wanting full disclosure. Why doesn't Customs do it by regulation? I think Customs thinks it's in the statute, and that's all I have. Hitachi says it's not in the statute. Well, I think our reading of Hitachi is it's implicit in the statute. It's not explicit in the statute. It's not clear. The words escalation clause are not in the statute, but how is that odd? I mean, does any statute have a precise description of certain levels of attention that must be made? Or updating as required. I mean, four words and we've solved the problem. Can you imagine if someone in a securities case where it says material information has to be disclosed argued that because it didn't say potential accounting losses in the statute, that that wasn't the material information? The judges do that. They say it's obvious. If you have an accounting loss, that's material. You should have disclosed it. It's not that different here. But then you have an implicit. Excuse me. Don't you think it would be better if it's not clear in the statute for the agency itself to adopt regulations after notice and comment? Well, certainly the agency has power to issue interpretive regulation, and to my knowledge has not done that in this statute. I'm not privy to what internal reasons there may be. Maybe it feels that if it goes on the road of starting to say this is in it, someone's going to say we didn't say this other one's in it, so someone's going to say it's not in it when it really wasn't, but they just didn't get to that one. I mean, that's a valid way to reason. Other than that, I don't have an explanation. If there are no further questions. No questions? Thank you, Mr. Levin.  Thank you, Your Honor. Listening to Mr. Levin, it's clear that the government would like to retry the fraud case that it brought against Ford. The fact of the matter is that these arguments that Mr. Levin just mentioned were made to the trial court, and the trial court expressly rejected any claim that Ford committed any type of intentional fraud in this case. Mr. Levin says that Ford knew about this work being done in Japan at the time of the entries. There's no support in the record for that. The testimony was undisputed that the orders did not specify whether the work was to be performed. The trial court made a finding. Well, in fairness to Mr. Levin, those were the basis for the finding of gross negligence. They may have also argued fraud, but I think he was fairly presenting them as the case for gross negligence. With respect to the issue of whether Ford knew that this work was going to be performed in Japan, I would submit that that is not the basis for the finding of gross negligence. The court's finding on gross negligence was just a straight you didn't include the value of these engineering orders, didn't pause to determine whether those engineering orders were relevant to dutiable value, which is the government's point of view. Well, it's your duty to ensure enough information to properly assess the value. That's right, Your Honor. When the value doubles over a period of time, it's not your duty to somehow make sure that's part of the value? I didn't quite double, but 40-something to 70-something is almost double. Well, the declared value of the dutiable merchandise was $63 million, and the government claims that there was an extra dutiable value of $21 million. Again, fine. But certainly a quantum change. That's right, Your Honor. There was, but the duty is what Ford relied on was the invoices that its vendors submitted and that it instructed its vendors to ensure the dutiable value of this merchandise. It's the same type of procedure that Ford and all exporters have used. There's no indication that Ford was doing anything that the industry wasn't doing in this respect. And with respect to the issue of whether Ford knew there was work being performed in Japan that wasn't being declared, there's just nothing in the records of that effect, and the court did not rely upon any such finding. In fact, it found that the orders on their face did not indicate where the work would be performed. With respect to the CF-28 issue, what happened was that in November 1989, Ford did respond to a CF-28 in which it gave the tooling order, which on its face indicated that there would be an audit, and it also told Customs that the value was $6,700, not $63,000 as was entered. But the point is, at that point, Customs knew that there would be an audit. It knew that there was a chance that the price would change. Mr. Levitt has not given any indication for what Customs would have done differently if in November 1989 Ford had disclosed on top of the fact that there would be an audit that there were also 204 engineering orders, which, by the way, Ford needed to perform an audit of before it could even begin to determine how they would affect the vehicle value. The fact of the matter is that Detroit Customs held open liquidation. Seattle Customs held open liquidation. Detroit Customs ultimately liquidated, but it liquidated against its own policy because there were outstanding CF-28s with respect to these items. So Mr. Levitt can't show how the failure to disclose the engineering orders in 1989 impacted Customs administration of its responsibilities at all. Okay. Thank you. Thank you both. The case is taken under submission. All rise.